IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

UNITED STATES OF AMERICA

vs. CASE NO: 3:19-cr-364-ECM

NAYEF AMJAD QASHOU

Defendant.

************************************************

SENTENCING

************************************************

BEFORE THE HONORABLE EMILY C. MARKS, UNITED STATES DISTRICT JUDGE, in Montgomery, Alabama, on Thursday, September 17, 2020, commencing at 10:05 a.m.

APPEARANCES

FOR THE GOVERNMENT: Mr. Joshua J. Wendell
Mr. Robert K. Nichols, III
Assistant United States Attorneys
OFFICE OF THE UNITED STATES ATTORNEY
131 Clayton Street
Montgomery, Alabama 36104

FOR THE DEFENDANT: Mr. Stephen P. Ganter
FEDERAL DEFENDERS
817 South Court Street
Montgomery, Alabama 36104

Proceedings reported stenographically;

transcript produced by computer

(The following proceedings were heard before the Honorable Emily C. Marks, in Montgomery, Alabama, on Thursday, September 17, 2020, commencing at 10:05 a.m.)

(Call to order of the Court.)

THE COURT: Good morning. We are here for sentencing in the case of United States versus Qashou, Case Number 19cr364.

Who do we have here for the government?

MR. NICHOLS: Good morning, Your Honor. Robert Nichols and Josh Wendell for the United States.

THE COURT: Good morning.

And who do we have here for the defendant?

MR. GANTER: Stephen Ganter on behalf of Nayef Qashou, Your Honor.

THE COURT: All right. And this is Mr. Qashou here this morning?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Good morning, Mr. Qashou.

THE DEFENDANT: Good morning.

THE COURT: And who do we have here for probation?

PROBATION OFFICER: Brandy Brendle with probation.

THE COURT: Good morning.

PROBATION OFFICER: Good morning.

THE COURT: Pursuant to the Coronavirus Aid, Relief, Economic, Security Act, the CARES Act, Mr. Qashou's change of

plea was taken via video teleconference where Mr. Qashou pled guilty to Count 1 of the indictment. At that time the magistrate judge orally found that for the specific reasons stated in the record and without objection from the parties, that the change of plea hearing in this case could not be further delayed without serious harm to the interest of justice.

There are no objections to that report and recommendation, and accordingly, I adopt the report and recommendation of the magistrate judge that the change of plea hearing conducted by video teleconference could not be further delayed without serious harm to the interest of justice.

I understand there is a plea agreement in this case. Let me hear from the government. Mr. Nichols, will you summarize the plea agreement for the Court?

MR. NICHOLS: Yes, Your Honor. Thank you.

This plea agreement is under Rule 11(c)(1)(A) and 11(c)(1)(B). In the plea agreement, the government has agreed to a bottom of the guidelines sentence in response to Mr. Qashou's plea of guilty to Count 1, false information to law enforcement, under 18, U.S.C., 1001(a)(2).

THE COURT: Can you speak up just a little or speak more closely into the microphone?

MR. NICHOLS: Yes, Your Honor. I apologize.

And the defendant is free to argue for a variance and

has waived his right to appeal or withdraw his plea. The government does agree to a third point for acceptance of responsibility in this case, and the government will dismiss Count 2 of the indictment after sentencing.

THE COURT: Mr. Ganter, do you agree with that summary?

MR. GANTER: I do, Your Honor.

THE COURT: All right. Is there any reason why I should not accept the plea agreement?

MR. GANTER: Not one that I can think of, Your Honor.

THE COURT: Okay. Mr. Qashou, do you understand that this plea agreement is pursuant to Rule 11(c)(1)(B), which means if I do not accept the recommendation of the government regarding an appropriate sentence in this case, you will not have a right to withdraw your guilty plea? Do you understand that?

THE DEFENDANT: I understand that.

THE COURT: All right. Thank you.

All right. I accept the plea agreement.

You can be seated. And just for the entirety of the proceedings, if you need to remove your mask while you are addressing the Court and/or are otherwise --

You can leave your mask off, Mr. Ganter.

-- if you are appropriately socially distanced from people as well, you may remove your mask. I want to make sure

that the court reporter can take down everything everyone is saying with sufficient clarity and that I can understand what you're saying as well.

I reviewed the following documents submitted in advance of the hearing: The indictment, the psychiatric reports previously filed in this case, the plea agreement, the addendum to the plea agreement, the presentence report, probation's sentencing recommendation, the government's motion for reduction in criminal offense level for acceptance of responsibility, which is Document 50, the sentencing memoranda and exhibits all recently filed and previously filed by the government and the defendant, the transcript of the prior sentencing hearing, and as one of the exhibits to the defendant's sentencing memo, the defense provided a video and I have watched the video multiple times.

I assume that the defendant has no objection to the government's motion for the reduction in criminal offense level, Document 50?

MR. GANTER: No objection, Your Honor.

THE COURT: All right. That motion is granted.

Does the government have any other documents or expect to call witnesses in this hearing today?

MR. NICHOLS: No, Your Honor.

THE COURT: All right. Mr. Ganter, does the defense expect to call any witnesses or present additional documents?

MR. GANTER: No, Your Honor. We were going to call -- I mean play the video for the Court, but Your Honor has already indicated that the Court has already reviewed it, so we will just proceed to argument.

THE COURT: All right. Very good. Mr. Ganter, have you and Mr. Qashou had at least 35 days to review the presentence report?

MR. GANTER: We have, Your Honor.

THE COURT: And I understand that neither from the government nor the defendant there are any objections to the PSR?

MR. GANTER: That is correct, Your Honor.

MR. NICHOLS: That's correct, Your Honor.

THE COURT: All right. In compliance with United States versus Booker, while I am not bound to apply the guidelines, I have consulted them and taken them into account on the issue of the appropriate range of sentence to be imposed in this case. There being no objections to the presentence report, I adopt the factual statements contained therein, and I make the specific findings that the offense level is 25. The criminal history category is I. The guideline range is from 57 to 71 months. The supervised release period is 1 to 3 years, and the fine range is from 20,000 to $200,000.

Does the government agree with those calculations?

MR. NICHOLS: Yes, Your Honor.

THE COURT: Does the defense agree?

MR. GANTER: Yes, Your Honor.

THE COURT: All right. Mr. Ganter, in the defendant's sentencing memo, there appears to be a request for a downward variance in this case. No motion -- it does not appear that any motion was filed, but I will construe the sentencing memo to contain a motion for a variance. Let me hear from you on that.

MR. GANTER: Thank you, Your Honor.

As I prepared my argument for this case, I kept thinking of its beginning. And I'm not quite sure where it began. One could think that it began when Mr. Qashou attempted in 2014 to walk across the border from Jordan into Syria. I guess someone could argue that it began in 2015 when he was first contacted by the FBI because of his attempted trip from Jordan into Syria. Or it could just be that there really is no beginning. But I think what we are finally realizing after all this time is an ending.

I think it began a long time before that. And I don't mean to disparage my client and/or his family, but I think that there were some problems that started out early on that went -- as both of his parents sort of testified to last time we were here I believe in July, that there were some problems and they sought assistance, and for whatever reason it was sort of dismissed as him being lazy, aloof, not working hard, not

committed. But clearly there was something odd about Mr. Qashou. And as he got older, he never essentially grew out of it, and the problems started to manifest in adulthood.

And I think that's exactly -- Your Honor asked last time we were here how could the Court grant a 16-level variance, and it became clear that the parties didn't have an answer to the Court's question, or one that was sufficient for the Court, anyway. And I think I arrived, after reading the transcript recently, that his behavior with respect to the fabrication to the FBI was not a result of the disorder. But the attempt to travel into Syria and his sort of -- I don't want to call it an obsession, but this belief that he had in ISIS is that he effectively was manipulated by it and for some reason felt some degree of loyalty in that if he did disclose the contents of those videos or the folks that he had spoken with, that somehow he would be betraying these folks who he was loyal to for no reason. And I think that comes from the disorder.

It's the same sort of misguided judgment that when his parents are arguing with him why won't he complete his studies and why is he focused on becoming an NBA basketball player when clearly he doesn't have the ability to become an NBA player, despite how hard he works or how many jump shots he takes or whatever -- it's that same sort of delusional belief that I think fed into what he was believing in 2014 and '15 and '16

and '17 and '18.

And sometimes you need an awakening, and this has been it. Not only for him, but for his parents. He's in therapy. He's getting better. It's not a finished product, and quite frankly, we don't even know if it ever will be.

I think there is another aspect of this case that the Court should take into consideration. If this Court sentences him to a protracted sentence of imprisonment, I believe that there will be irreparable damage done to him. He does not have the ability to effectively interact with other folks, and he certainly does not have the ability to interact with people who have been in and out of incarceration for a number of years. This Court doesn't have any control as to where he will go, but it certainly does have control with regard to how long he will go there.

When he was going through the mental health evaluation, his mother -- and we make reference to this in the supplemental sentencing memorandum -- received a phone call, and this is at an FCI detention facility where he's getting his mental health evaluation. And she had just put money on his books, on his account, and she's receiving a phone call from another inmate, and all the money on his books has been wiped away and used by other folks. That's because the truth is, he will be a target.

The BAU made reference to certain -- and I think that

was Defendant's Exhibit 1 from the first sentencing memorandum. The Behavioral Analysis Unit made reference to tools that could be put in place to ensure everyone's safety. That would involve this Court putting in strong supervision. If this Court is inclined to sentence him to prison, we would ask for a very limited duration. And then afterward, the Court could impose upon him conditions of supervised release that might be more stringent than it normally would. Specifically, home confinement; specifically, status conferences; a requirement that the probation officer meet with him more frequently than they normally do. And I think some of those conditions along with his continuing therapy would alleviate some of the concerns that this Court may have and that the government may have.

But to send him off to prison where I have no doubt he will be identified as a target immediately -- because we've seen it happen here. And here at least he had myself, Ms. Irwin, and my investigator, Ms. Srikantha, going over and visiting with him daily. When he goes off to prison, that is a luxury he will not have. He will be required to fend for himself, and he just doesn't possess the ability to do that.

In 2016 when the FBI was using confidential sources to speak with Mr. Qashou, there was a discussion between one of the agents and the confidential source. And I'm reading directly from that transcript. The confidential source says, I

mean, he doesn't say much because he's really like socially awkward. Like, when he says he wants to say something, and in quotes, I'm not sure. He'll sit there and think about it for like 10 minutes. And then, you know, I'm thinking, I'm confused, I'm not sure, and it will be over something stupid like whether he wants to play basketball or not. Like, you know.

And I think that was why the BAU came to this sort of conclusion that something was wrong with him. We just don't know what. And at some point in time, they had to make the decision of whether or not they were going to charge him, and they did, and he pled guilty. And as part of the requirement, he went off and he had a mental health evaluation. And I think given all of the evaluations, they arrived at the conclusion that he's somewhere on the autism spectrum disorder, but we can't really say for certain because it's something that has to be diagnosed early on. Well, I think he had it back then, but for whatever reason it wasn't diagnosed, and it's followed him into adulthood. And he and his family are paying an awful price.

We are hopeful -- we were disappointed that the Court did not accept the plea agreement. We understood and still do the Court's concerns about the 16-level variance. But that 16-level variance is being driven -- or the need for the 16-level variance is being driven by the 12-level enhancement

in this case.

THE COURT: Well, the 12-level enhancement is because what Mr. Qashou lied to the FBI about involved international terrorism. And so in order for me to support the variance that had been requested initially, I would have to ignore, essentially, the fact that nobody seems to be talking about, and that is we're not just talking about a young man who is confused; he was actually engaged in behavior, affirmative behavior, regarding -- and behavior to hide his activities in support of international terrorism.

MR. GANTER: One hundred percent correct. There is no getting around that. It is what I believe, however, the exposure and his delusional belief, if you will, that he thought he could actually make a difference.

In his February 2019 interview with Theron Nolan (phonetic), who is a special agent and who's, I believe, an expert in this area, he is asking Mr. Qashou about his plan when he got there, and Agent Nolan seemed to indicate that's not a very good plan. I don't think that he ever thought this thing through to its ultimate conclusion. And I think that he was believing that he was doing -- I don't want to say good, but what he thought he was supposed to be a part of. And that thinking didn't come from his parents or anything that he was exposed to. It came specifically from these videos that he watched. And it messed him up, and he's paid a heavy price for

it. He's been under supervision by the FBI for a number of years, and there's no reason to believe that that will end upon his release.

THE COURT: When you say supervision, do you mean surveillance or he's been actually supervised by the FBI?

MR. GANTER: Initially, in 2015, he was -- December of 2015, for a period of two weeks, he was required to check in with them, and he did. He complied with that. At some point in time, however, there were confidential sources that would reach out to him for various times. I believe it was spring/summer of 2016 for a period of time, and then there was another confidential source in 2019 in the spring/summer of 2019.

So I think that he was under some degree of surveillance and/or some degree of contact with the FBI. There were a number of interviews, and I think probation can speak to this, about how many interviews that he had with the FBI or task force officers with the FBI for that period of time. So there was a lot of dialogue going on between Mr. Qashou and the authorities.

I say that to say that with certain conditions, that this Court can sort of flex its muscle, if you will, and come up with a creative way to essentially ensure and deal with the subject matter, terrorism, without irreparably damaging Mr. Qashou. The disorder is not going to go away. He will be

exposed in prison, and he will not have -- and he does not possess the means to defend himself. And I believe that that would be a shame, because right now he is a gentle man. A gentle young man. And I think he is trusting, possibly too trusting, and he's going to a place where a lot of its occupants don't have many of those characteristics.

So we are asking for a downward variance within, obviously, the Court's discretion, and to make up for that variance, that maybe the Court would impose home confinement for a protracted period of time along with a requirement that he maintain his therapy, that he constantly check in with this Court and/or his supervising probation officer. And we feel that would be consistent with the Behavioral Analysis Unit's sort of recommendation, which I think came out in 2019. I'll close with that, Your Honor. Thank you.

THE COURT: And, Mr. Ganter, I'm going to have some additional questions, but I want to hear from the government before --

MR. GANTER: Very well.

THE COURT: -- we engage in that.

MR. NICHOLS: Your Honor, may I have just one moment, please?

THE COURT: Yes.

MR. NICHOLS: Thank you.

(Brief pause in proceedings.)

MR. NICHOLS: Your Honor, this is obviously a difficult case, as we've discussed before, and obviously we're here a second time. I can't dispute anything that Mr. Ganter said as far as Mr. Qashou's mental health status. You know, we've informed the Court before that we have obviously had concerns all along about his mental health status, which led to --

THE COURT: Can you -- I'm sorry. I'm having a hard time understanding you. Maybe pull the microphone closer to you as well.

MR. NICHOLS: Yes, Your Honor.

THE COURT: Thank you.

MR. NICHOLS: We've had concerns all along about Mr. Qashou's mental health status, which led to the evaluations that we did -- or that we asked for and that the defense sought as well. So again, I can't dispute counsel's arguments, but I would like to shed some light just for starters on the difference in the government's position before as far as the previous agreement and the one now just in order to have full candor with the Court.

You know, as was alluded to in previous filings, you know, I made a mistake in my initial calculations of the guidelines that those calculations did not include the enhancement that probation end ed up finding that was appropriate in this case.

THE COURT: There were two enhancements. Are you talking about one or both?

MR. NICHOLS: The 12-level enhancement, Your Honor.

And so during the initial plea negotiations, I was operating on a different belief about what the guidelines would look like, and that initial belief was in the neighborhood of 8 to 14 months. Mr. Qashou at that time already had five months in custody, and, you know, at the time we were still looking into what his potential mental health issues might be, working with defense in trying to do that, as they seemed to be potentially prominent issues, in considering what to do with Mr. Qashou.

Regardless of that mistake, you know, we stuck to the agreement that we made with the defense, though we did not dispute the guidelines calculation that probation came to, which obviously was much higher than we initially anticipated.

Now we are here under a new agreement. We continue to contend that the guidelines calculation is accurate. Obviously that has not changed from the previous plea agreement to now. But we also don't dispute that there appear to be some mental health concerns which may warrant a variance if Your Honor finds that that is appropriate in this case.

You know, it's hard without -- again, Mr. Ganter's correct that without the benefit of mental health screening and treatment and things going back to the developmental years of a

person, it is hard to -- or I guess impossible to diagnose someone with anything, particularly autism spectrum disorder, and so -- and I guess we're not going to have a diagnosis of that in this case. We've got, you know, a rule-out diagnosis, which is I guess speculation on behalf of mental health experts, and so, you know, it's hard -- it would be hard for the government to rely on that specifically to ask for a variance in this case, and that's why we're not doing that. We do believe that the guidelines are appropriate as have been calculated.

You know, obviously Mr. Qashou's behavior was of deep concern to the government, and that's why we brought charges in this case. You know, some hybrid of sentencing, you know, may be appropriate here, but -- I'm not sure what all the options are, but we do continue to recommend the bottom of the guidelines is an appropriate sentence.

Thank you.

THE COURT: Mr. Ganter, you have asserted that potentially having a limited amount of incarceration or duration of incarceration with enhanced supervision would be appropriate. But when I've looked at the PSR in this case, to date it does not appear to me -- and you can correct me if I'm wrong -- that Mr. Qashou responds well to supervision. Isn't there historically an indication that he does not do well when he's supervised?

MR. GANTER: Well, he's been on supervision since February 11th.

THE COURT: I don't mean official supervision under the government's watch. I'm talking about the fact that his family had for years attempted to encourage him to improve his behavior. They sent him to the United States. His father entered into a behavioral contract with him to try to get him to right the ship, so to speak, and none of those things worked. In fact, there's testimony from the initial hearing that Mr. Qashou does not do well when he's pushed.

How does that square with your assertion that supervision is more appropriate here than incarceration?

MR. GANTER: I think because it's the degree of push, Your Honor. There the push was, essentially, please do this. Please do this. Why won't you do this? How come you can't go to school like your brother and do well in school? How come you're lazy and not doing your studies? With no understanding of what the real problem was, that he has -- because he is on -- he suffers from autism spectrum disorder, that he essentially becomes obsessed with -- whether it's play ing basketball or whether it's, hey, I'm going to go find a wife or whether it's I'm going to watch videos of ISIS all day. He essentially -- if you have the right mechanism to essentially make sure that he is complying, then that mechanism can be used as a threat to go to prison. And I think that's exactly what

the Court has here. It has the ability to hold that real, credible threat, a severe sanction, if he should not comply.

And when we talk about the lack of compliance, we are talking about a family that is now completely engaged and able to identify his issues. We're talking about an individual who now recognizes that any sort of deviation from supervision will not be tolerated and result in severe consequences.

THE COURT: So we're looking going back to 2014 when he attempted to cross the border into Syria, to interaction with the FBI from 2015, 2016, 2017, 2018, and 2019. None of those interactions were enough to dissuade him at least up until 2016 when he was passing ISIS propaganda videos off to confidential informants. That was not enough to dissuade him.

My question really at the end of the day is what -- explain to me how, based on his previous history, I can be certain that a level of supervision now would get his attention where being put on the no-fly list and constant interactions with the FBI was not enough for him to alter his behavior.

MR. GANTER: I don't think he had any idea in 2015, '16, '17 that what was going on -- or he didn't have the ability to comprehend it. Certainly if I get off the airplane in October of 2015 and I'm in Atlanta and I'm about to go take the shuttle to get my car out of the blue lot and I'm approached by FBI agents, that is going to have a distinct impact on most people. And for him, it didn't have the sort of

impact that one would have expected. I think at that point in time someone would reverse course in their behavior, but he did not. And I think that's where exactly the disorder comes into play.

THE COURT: Well, this is -- you are absolutely correct when we started this hearing and you said this is a difficult case. It is. And I have spent hours reading the documents submitted, watching the video you submitted multiple times, and what I can't square is what I am hearing other people characterizing Mr. Qashou does not match the behavior that he engaged in for several years.

Specifically, I want to talk about the fact that he downloaded an encrypted app, made unsolicited communications to members of terrorist organizations -- unsolicited -- and over the course of several years, took active measures to cover up his activities, to communicate with other people and say -- and warn them, I am being watched by the FBI, you need to be careful what you're doing, and removing the app from his phone, lying about his use of the app, and in communication s with confidential informants saying, I won't share this information with other people, only with people I trust, which indicates a level of awareness and understanding of exactly what he's doing. And I can't square that with what I am hearing from you about his being confused, not understanding the repercussions of his actions, because he took very affirmative steps to cover

his tracks and to conceal his activities.

MR. GANTER: Cannot dispute that at all. Only to say that it almost sounds like he is -- and he's not. He's not a child. But his sort of -- this fanciful sort of almost like fantasy thing that he's doing, like trying to go play basketball or I'm going to hop on a plane and get married. This sort of activity that he's engaging in seems very consistent with that kind of sort of behavior that just makes no sense.

He didn't have any money to go to Turkey. He is financially dependent solely upon his parents. He didn't have -- he couldn't catch a plane to go to Turkey. He had no ability to do these things that he was making reference to at all. He's just, I believe, talking. Maybe he believes it, maybe not, but there was no call to action that he could take on his own. He was never -- when he tried to fly out and go to Palestine or Jordan, he wasn't permitted to get on a plane. It's as if he feels like if he can explain his position, then people will understand it. And I keep telling him, and we have told him, there's no more explaining it. It's stopping the behavior. It's recognizing that there is a problem here and it's stopping the behavior. And I think that there is a mechanism by which we can do that without sending him to prison for an extended period of time.

THE COURT: What do you consider an extended period of

time? What level of variance are you seeking and why? Well, I understand the why. What I want to know is why -- I want to hear from you what do you think would be an appropriate period of incarceration, if any, and why would that particular level be appropriate in this case?

MR. GANTER: I think it's all about how long. I think that is really the key. If the Court were to impose a sentence of 57 months, he essentially would be gone for four years. I think that that would result in irreparable damage.

THE COURT: But more so than any other defendant I have in front of me? I have a lot of defendants who come in front of me who do not want to go to prison and may not do particularly well in prison, but that has never before been argued to me as a basis for a variance.

MR. GANTER: I think behavior -- past behavior involves future behavior, and I think individuals most of the time, Your Honor, that come before Your Honor have visited prison before, maybe visited prison multiple times before, and I figure if they don't want to go back, then they probably shouldn't engage in the behavior that sent them there in the first place.

So there are some people who they may say they don't like prison, but I think it's easy for the government to stand up, and they have stood up in the past, and they've said, well, we can't tell that they don't like prison because they keep

messing up and going back and doing things that sends them back. We don't have that here. We don't have an individual who knows how to get along with folks in prison. We don't know -- we don't have an individual who can go and make buddies with someone else and kind of hang out and make it like a thing to do.

I don't know why folks keep coming back to prison, but I know that it can be a bad and scary environment, and I also know that there are some folks who are not built for it. He is one of those folks. He is not built for it. He wasn't in custody for three to four months, and he had money stolen off of his books and had an inmate calling his mother.

To go back to the Court's original question with regard to what degree of variance, I would think -- and this is taking into consideration good time and time that he has already spent. I was thinking somewhere along the lines of 18 to 24 months with strong supervision afterwards. That would -- I don't know -- they would take into consideration the time that he's already done, which is approximately five months. He would get good time, and I assume that he would have the benefit of a halfway house if COVID has not essentially taken that out of the equation. It would not keep him incarcerated for an extended period of time. Hopefully he would be sent to a medium or below, maybe a low, maybe even a camp. But all of those factors would have to be taken into consideration, I

believe.

THE COURT: Well, the determination about where he would be housed, you know --

MR. GANTER: Obviously.

THE COURT: -- is with the BOP.

MR. GANTER: Obviously.

THE COURT: Anything else from the government on the variance?

MR. NICHOLS: Your Honor, may we request a five-minute recess before responding?

THE COURT: You may.

MR. NICHOLS: Thank you.

(A recess was taken from 10:45 a.m. until 10:54 a.m.)

MR. WENDELL: May I proceed, Your Honor?

THE COURT: Go ahead, Mr. Wendell.

MR. WENDELL: For a number of years, the FBI monitored the defendant. They gave it time. The same concerns that Mr. Ganter's talked about. And time again has shown that the number one thing we don't know is what he's going to do in the future. And the core duty of both Article I and Article III in this instance is to protect the public, protect the nation. This defendant has shown, demonstrated his propensity to be influenced, willingly or unwillingly, by something that he can control or something he can't control. He has become a target for this sort of propaganda, and his susceptibility to that

propaganda creates a danger to the United States and a danger around the world.

He will likely not be the guy that comes up with the next mastermind scheme. Here's the tragic part: If there is not some big thing in his life that keeps him from doing it, he might be the next guy that somebody, some politician on the other side of the world straps a bomb to and says, go that way. And because he's been influenced to such a degree that he's buying what they're selling, he does it. That creates a risk.

And how does the Court deal with that? Part of that is going to be confinement. Part of that is going to be a period of imprisonment. But that's a double-edged sword, as I'm sure the Court has considered, because when he's in the Bureau of Prisons, in the custody of the BOP, what's he thinking? What's he doing? Who's he exposed to? Because at the end of the day, the Court wants somebody to come out the other end of imprisonment and wants somebody to come out the other end of supervised release that's not going to place the public at risk. That's a huge consideration.

We believe that the guidelines are accurate. We believe that a bottom of the guidelines sentence is appropriate. But a downward variance to address the fact, one, that there is some complicated mental health issues here that cause him to be more prone to these sorts of influences than perhaps a normal person. A downward variance of about 12

months or so would recognize that fact. A downward variance of about 12 months would also better serve to effectuate the end state of protecting the public, better serve to effectuate the end state of keeping him from being a tool to be used by somebody to spread terror. And we do that by showing him what kind of a rule of law this nation has. We do that by ensuring that he is supervised to the max. We worry that if he is just locked up as long as the Court can lock him up, there's going to come an endpoint to that, and what comes out the other end of that? I'm sure the Court's thought of that.

Without straining the point, that is why we are at the bottom of the guidelines point of 57 months. I don't know that we get any more juice for the squeeze by going north into the guidelines, and I'm not sure that a 12-month downward variance or somewhere in that neighborhood isn't also appropriate, because we don't want to over water the grass and we don't want to further disassociate himself from his country such that when he comes out the other end, all we've done is create more of a threat.

And the Court's indicated a couple times that nobody's really addressed that elephant in the room. Those are our thoughts on that elephant in the room. We don't know what kind of a threat the defendant posed, which is why we brought charges. The FBI wasn't clear on what he was going to do but worried enough, and so were we. He needs prison. He has acted

in such a manner that puts the public at a risk, and that has to be addressed. Tempered with that is the fact that one day he will be a free man again, and who do we want him to be, what do we want him to believe, and how can this Court impact that. That is where our bottom of the guidelines recommendation comes from. That is why when Mr. Ganter asked for a downward variance, we understand that there might be some basis to that. But at the end of the day, the effect that we're trying to create is a safe public so that he is no longer a threat to our national security.

MR. GANTER: Your Honor, may I address some of that?

THE COURT: You may.

MR. GANTER: At the end, Mr. Wendell made reference to what do we want him to believe and how do we want him to act. And certainly the action part is something that this Court and the government, Article I and Article III, can be concerned about, and maybe even to a certain degree believe. But the last time I checked, an individual gets to believe what they want. I've stood up here and represented KKK guys who have burnt crosse s in front of black neighborhoods. And although personally I didn't agree with it, they had a right to counsel and effective assistance of counsel. And although I didn't believe the way they believed, I did my job. We don't get to control the belief. What we can control is the acts. And I think to a certain degree that the government has the ability

to control the acts.

I'll just read from Mr. Wendell's memo: "From the outset, the government believed that Qashou would benefit from mental health treatment, and there is concern that a lengthy term of imprisonment might further radicalize him and perhaps hinder his rehabilitation." And I think the key word there is "lengthy."

So from what I hear from Mr. Wendell, they would be willing to say that maybe a 12-month variance and I guess a sentence down to 45 months, anything above that might be too much of a sentence. And what we're saying here is to take in the damage and the exposure of him in that system to those folks and what they could do to him and cause irreparable damage, and we think anything beyond 18 to 24 months, that's when it starts to tip.

Thank you.

THE COURT: Typically I allow a defendant to be heard before I pronounce the sentence, but because the variance will go directly to the sentence imposed in this case, I'd like to give you, Mr. Qashou, an opportunity to speak if you would like to do so. I will give you another opportunity before I pronounce sentence also to speak, but I'd like to hear from you if you have something to say before I rule on your variance. You don't have to speak, but this is your opportunity to do so.

THE DEFENDANT: I have nothing to add, Your Honor.

THE COURT: All right. I'm going to take a 10-minute recess before I issue my ruling.

(A recess was taken from 11:02 a.m. until 11:14 a.m.)

THE COURT: Mr. Qashou, I have -- like I said earlier, I've spent a lot of time looking at your case and thinking just constantly about your case. And I cannot -- I feel such significant sympathy for your family, because I had an opportunity to hear from both of your parents at the last sentencing hearing, and they are truly suffering because they are desperate to help you, and so far you have been resistant to that help, which I don't understand.

You have a very loving and supportive family who has gone to great lengths so far as to moving here to be with you, to help you, and provide you with support. And that is not something that I see often, and you are actually quite fortunate in that regard that you have such a loving family.

And then I hear the characterizations of you by others that you are confused, you didn't understand what you were doing, you are possibly on the autism spectrum, which causes you to not fully appreciate what others are communicating to you or makes you potentially more susceptible to manipulation by others. And I am having a very difficult time squaring that with the fact that the only manipulation that has been successful with you, to the extent that there was manipulation, was that of a terrorist organization.

You have not been susceptible to the influence of your family. You have not been particularly susceptible to the influence of the FBI's involvement with you. You have been actively resistant to it, which is why we are here today. You lied to the FBI about matters involving international terrorism.

And while I do take into full consideration the fact that you do have clearly some issues with mental health that require treatment, I have to consider that fact alongside an examination of your actual behavior. Because to me, it's very easy to come into court and say things, but it's actual behavior that gets my attention the most.

And so when I look at your actual behavior that led us here today, not only did you express support for a terrorist organization, you took affirmative steps to join a terrorist organization and you took affirmative steps to recruit other people to join a terrorist organization. And your attorney or the government -- I can't remember who -- made a statement that we don't want to do anything that would further dissociate you from this country. I don't think that you -- it has been adequately communicated to you that it is your actions that are dissociating you from this country. You in your letter to this Court acknowledged to me that your actions have contributed to this situation, and that is not accurate. Your actions have actually caused this situation. And I don't see much evidence

that that has actually been communicated to you to such an extent that you have a full awareness of the fact that your behavior is what has directly led us here today.

And I am -- I have put a lot of thought into whether or not a variance would be appropriate in this case, and at the end of the day, it's my job to determine what an appropriate sentence is for you. Guidelines, no guidelines, at the end of the day, what is an appropriate sentence for you considering your characteristics, your history, and the actions that you have engaged in.

And the very reasons why your attorney or even the government has said that I might want to vary down from the guideline range in this case is because you do have some mental health issues and you may not have a full awareness of what you have done or you may not do well in prison. When I weigh that against your actual behavior, I see somebody who has an awareness of what you're doing so much to the extent that you chose to actively conceal your behavior. And when somebody tries to cover up what their actions are, that indicates a full awareness of the wrongful nature of what you're doing. And so for that reason I am going to deny your motion for a variance in this case.

Mr. Ganter, do you -- or you, Mr. Qashou -- have anything to say in mitigation or otherwise before I pronounce sentence in this case?

MR. GANTER: Nothing further, Your Honor.

THE COURT: Mr. Qashou, do you have anything you would like to say?

THE DEFENDANT: Well, I just want to say that I understand how my actions caused this, but that -- and though I can't understand a lot of what's been said, that in no way has my actions been related -- like has meant that I'm against -- like that I want to do something against my country in any way, but it was just something that I left and -- I left and that -- I left and -- what I'm trying to say is that like I didn't understand that my actions were contributing to -- that they were involving --

THE COURT: Mr. Qashou, can you speak a little bit more directly into the microphone?

THE DEFENDANT: I want to say that I didn't --

(Brief discussion off the record.)

THE DEFENDANT: I just wish that people -- that that would be seen -- that the humanity in me would be seen and not the things that don't represent me despite that my actions caused me to be here today. That's all.

THE COURT: All right. Thank you, Mr. Qashou.

MR. GANTER: Judge, I'll just add -- and I believe that that last statement or attempted statement from Mr. Qashou just further buttresses our point. He does not have the ability to comprehend and to engage with other folks, and by

denying the variance I believe that this Court will -- and I'm not saying that the Court does not have other considerations. Certainly it does. But I think that right there is a demonstration of what Mr. Qashou will face for a number of months going forward.

THE COURT: Mr. Ganter, this underscores, again, the difficulty of this case. I have to say, I reject the notion that there are people who are not built for prison and there are people who are built for prison. When I have people in front of me who are facing potential incarceration, I take everything into consideration. And what I have in front of me is a case involving an individual who over a course of years engaged in behavior that is extraordinarily concerning to the Court. And even after being put on notice that he was on the radar of the FBI, that was not enough to dissuade him from continuing on with his behavior. That is of concern.

I've read your letter, Mr. Qashou, that you wrote to the Court where you indicate that you are an ordinary person who enthusiastically meets different people, that you're glad to interact with people, and that does not square with the characterizations that I'm hearing about you as an individual.

And I have people in front of me, and never once have I thought to myself, this person was destined for jail; he's going to do great in prison. I don't look at it that way. The BOP will take into consideration Mr. Qashou's characteristics,

and they will be the ones to place him in a facility that's appropriate for him.

And while that's a consideration, I am looking at the crime that you have pled guilty to, and I am looking at the circumstances surrounding that crime. And without getting into too many specifics, I am very concerned about your expressed willingness to engage in activities that would be harmful to yourself or to other people and that there are only certain threads such as your love for your family or your religion that prevents you from engaging in those activities. The fact that you have expressed a willingness to engage in dangerous activity and lied to the FBI multiple times -- I know you pled guilty to one instance, but you lied to the FBI multiple times while they were investigating you and your actions. That does not square with somebody who is not capable of understanding your actions.

I know you have a criminal history category of I, and that has been appropriately taken into consideration with the guidelines. The guideline range is from 57 to 71 months. And I can -- even within the guidelines could give you more of a sentence than what the government recommends.

I understand the concern that your attorney and your family have for you and for your well being, and I share that concern, and I trust that the BOP will place you in a facility where you will be able to remain safe and that will not have

what your attorney has described as an irreparable injury if you are sent to prison.

Again, I send people to -- or sentence people to prison all the time, and I know that it is life changing. But your crime is of such a serious nature involving your choices, your affirmative choices, having much support and attempts to put you on the right path, I am not convinced that an enhanced level of supervision by the U.S. Probation Office is going to succeed where others have thus far failed, and so for that reason I think a period of incarceration within the guidelines is appropriate.

Mr. Qashou, your sentence will now be stated, but you will have a final chance to make legal objections before the sentence is imposed.

I have considered and consulted the sentencing guidelines and evaluated the reasonableness of a sentence through the lens of 18, U.S.C., Section 3553, and it is the order, judgment, and decree of the Court that you are to be incarcerated for a period of 57 months. I've considered the guideline calculations, the arguments of counsel, and I've taken them under advisement. I find that this sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing.

Furthermore, this sentence is reasonable when considering the following sentencing factors found at 18,

U.S.C., Section 3553(a): Mr. Qashou, your nature and characteristics as well as the circumstances of the offense, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes, to provide you with the needed educational and vocational treatment or medical care that the Bureau of Prisons can provide in the most effective manner, and to avoid unwarranted sentencing disparities among defendants.

Specifically, Mr. Qashou, I find that a sentence of 57 months is an appropriate sentence in this case because you lied to federal agents during the course of ongoing investigations, including destroying evidence in an effort to cover your tracks. You lied to FBI agents after being interviewed by them on multiple occasions. And most troubling to the Court is the fact that you lied to the FBI about your communications with suspected terrorists, including your communications and attempts to join the terrorist organization known as ISIS. I'm also concerned about your communicated willingness to at least consider, if not more, engaging in your own terrorist activities either on U.S. soil or abroad. I am very concerned about the fact that you provided terrorist propaganda videos to others in an attempt to recruit others to ISIS, which also indicates to this Court a certain level of awareness of your actions, particularly in light of the fact that you

communicated to undercover agents that you were very cautious about who you were communicating to about your activities and to whom you would share the ISIS propaganda videos, which indicates very strongly to me that you have a full awareness of the wrong nature of your actions.

I do recognize you have an extraordinary family, and you are very fortunate in that regard. And I don't believe that they deserve to have to be here today. And I recognize fully that you have received some mental health care treatment, that you have been diagnosed at least by one doctor as being on the autism spectrum and by others who were not able to rule it in or out as a diagnosis for you. But that diagnosis does not fully negate your actions, and it certainly does not square with your recognition that your actions were unlawful and were dangerous and that -- the fact that you, again, took overt steps using encrypted apps and lying to the FBI demonstrates your full awareness of what you were doing.

I do recommend that you be designated to a facility where mental health treatment is available to you, and I certainly hope and encourage you to continue on with your mental health treatment. I recommend that you be designated to a facility where vocational training is available to you so that when you get out of prison, you will have some skills that you need to find gainful employment.

Mr. Ganter, would you like me to recommend that

Mr. Qashou be designated to a facility close to Auburn so that he can maintain contact with his family?

MR. GANTER: Yes, Your Honor.

THE COURT: I recommend that the BOP designate you to a facility as close as possible to Auburn, Alabama, so you can maintain the close ties that you have with your family and so that they can continue to communicate effectively with you.

Upon your release from imprisonment, you shall be placed on supervised release for a period of three years. Within 72 hours of your release from custody, you must report to the probation office in the federal district where you are authorized to reside. While you are on supervised release, you shall comply with the mandatory and standard conditions of supervised release on file with this Court.

I also order the following special conditions: You shall complete 30 hours of community service at a time and location approved by the United States Probation Office. You have indicated a willingness to help other people, and I believe through community service you can learn and see that not -- you don't have to go abroad to try to do good things. There are people who need help right here close to you and that you have the ability to engage in activities, humanitarian efforts, philanthropic activities immediately. That is within your capabilities.

You shall participate in a mental health treatment

program approved by the United States Probation Office as directed, and you shall contribute to the cost of any such treatment based on your ability to pay or the availability of third-party payments.

You shall submit your computer or other electronic communications or data storage devices or media and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct and by any probation officer in the lawful discharge of that officer's supervision functions.

You shall pay to the U.S. District Court Clerk a special assessment fee of $100, which is due immediately. Based upon your inability to pay, I waive the imposition of a fine, and I find that there is no identifiable victim who incurred a financial loss as a result of this offense.

I am inclined, Mr. Ganter and Mr. Nichols, to allow Mr. Qashou to self-surrender at a later date. Is there any reason why I should not allow that?

MR. WENDELL: Before we reach that issue, Your Honor, we would also ask that you add as a special condition of supervised release that the defendant not be able to access any encrypted applications on any computer, phone, et cetera; the sorts of applications he was using to communicate with.

THE COURT: Mr. Ganter?

MR. GANTER: No objection.

THE COURT: All right. I so order.

Mr. Qashou, you shall not use or access any encrypted applications on any computerized device, whether a phone, a computer, an iPad, like the Surespot application that you were using. Do you understand?

THE DEFENDANT: I understand.

THE COURT: All right. Let me hear from you on remand versus self-surrender. Is there any reason I should not allow Mr. Qashou to surrender at a later date?

MR. WENDELL: We cannot identify any exceptional circumstances that would prevent him from surrendering today, Your Honor.

THE COURT: I'm sorry. I didn't understand.

MR. WENDELL: Yes. We don't believe there's any exceptional circumstances that prevent him from surrendering today, Your Honor.

MR. GANTER: I guess I'm confused on what the government is requesting.

THE COURT: Yeah, I am a little bit, too.

To be remanded today or to allow him to continue -- he is not currently incarcerated.

MR. WENDELL: Right, Your Honor. And we are saying that -- I apologize. That was inartful of me. We would ask that he be remanded today.

THE COURT: What's the basis of that?

MR. WENDELL: All of the things that the Court articulated when announcing sentence -- the threat that he poses to this district, the characteristics of the crime that he has pleaded guilty to, the other actions undertaken by him in the commission of his offense -- we believe that he should be remanded to the custody of the United States Marshal today, Your Honor.

THE COURT: Mr. Ganter?

MR. GANTER: Your Honor, the government in February agreed that he should be released after undergoing a mental health evaluation. He was placed on electronic monitoring in February. He has complied fully with every one of the conditions that has been placed upon him.

I would also argue going -- because due to the pandemic, individuals who are in custody and being sentenced are not being transported to the BOP. Thus, all of the mental health treatment, all of the programs, everything that the Court is asking that he get at the BOP, we have no idea when he will get that treatment. He is also undergoing mental health treatment, and I just heard that he has a medical appointment -- a dental appointment -- next week because apparently when he was incarcerated before he got a mouthful of cavities. So all of those facts and circumstances, we believe that he should be permitted to self-surrender.

I would also point out individuals that are in custody and they go into the BOP, they get a higher classification level because they are in custody. If he is permitted to voluntarily surrender, then his classification level will be impacted, it will be lower, and thus he's more likely to go to a lower-tier facility, which we believe would be necessary under these circumstances. So we would ask that he be permitted to self-surrender.

THE COURT: Ms. Brendle, let me hear from probation about remand versus surrender, and specifically tell me how Mr. Qashou has done on supervision thus far.

PROBATION OFFICER: Judge, probation had no issues with the defendant while on pretrial bond on release. He would continue to stay on an ankle monitor or LM until his self-surrender date, so probation would recommend that he be able to voluntary surrender.

THE COURT: I just want to make sure I heard you. Probation does not have an objection to his being permitted to surrender at a later date?

PROBATION OFFICER: That's correct, Judge. Judge, may I approach?

THE COURT: You may.

(Brief discussion off the record.)

THE COURT: All right. Mr. Qashou, I am going to allow you to surrender at a later date. While I have noted

that I have significant concerns about you, the fact that you have done well and you have been compliant while you have been out on supervised release pending this sentencing factors into my decision, and I am cognizant of the fact that the BOP will use that determination in -- or will use that ruling to aid in their determination of an appropriate facility for you to be housed in.

I do encourage you to continue on in the same manner that you have comported yourself while you have been out on supervised release, because any violation of your term of supervised release will result in your immediate incarceration. Do you understand that?

THE DEFENDANT: I understand, Your Honor.

THE COURT: All right. I'm also going to order, if you have not already, to surrender your passport, and I am going to restrict you from traveling outside of the Middle District until you report to a facility where BOP designates you to report. You may not travel outside of the Middle District of Alabama until you go to report to the BOP. You shall surrender at the institution designated by the Federal Bureau of Prisons before 2 o'clock p.m. on October 16th. Until that time, you shall comply with the conditions of release that were previously imposed by the Court.

Are there any objections to this -- hold on just a second.

(Brief discussion off the record.)

THE COURT: And I want to clarify that the travel restriction -- obviously you cannot travel now. You are on electronic monitoring. The travel restriction is also to be enforced while you are on supervised release after you complete your period of incarceration. You may not travel outside the district. Your attorney -- obviously his family is located in Auburn, Alabama, right now. As conditions may change in that regard, that may need to be addressed down the road, but as of right now, when you are on supervised release, you may not travel outside the Middle District of Alabama unless you get explicit permission from the Court to do so. And to the extent you may have more than one passport, you must surrender any passport you have that would enable you to travel outside this country.

Are there any objections to this sentence or the manner in which I have pronounced it?

MR. WENDELL: None from the United States, Your Honor.

MR. GANTER: Your Honor, just based upon earlier arguments that we've made, we object to the sentence as substantively unreasonable, but nothing other than that, Your Honor.

THE COURT: All right. And for the reasons already stated by the Court, your objection is noted but is overruled.

Mr. Qashou, the sentence is ordered imposed as stated.

Mr. Ganter, I believe Mr. Qashou has waived a number of his appeal rights in the sentencing agreement -- or the plea agreement. Excuse me.

MR. GANTER: That is correct, Your Honor.

THE COURT: Mr. Qashou, you do have some limited appeal rights available to you that were not waived by your plea agreement.

Mr. Ganter, have you discussed with Mr. Qashou his appeal rights?

MR. GANTER: Yes, Your Honor, to the extent that he possesses them, and I will continue to advise him.

THE COURT: Very good.

Does the government have any motions to make?

MR. NICHOLS: Yes, Your Honor. We move to dismiss Count 2 of the indictment.

THE COURT: I assume there's no objection?

MR. GANTER: No, Your Honor.

THE COURT: All right. Count 2 of the indictment is dismissed. That motion is granted.

Mr. Qashou, I want to encourage you to take full advantage of your family's support system. That is something that I have been extraordinarily impressed by. I think very highly of your family based on everything I have seen that they have done for you. They are here today, obviously, lending you support, and I think that is going to be something that you

will -- that will serve you quite well in your continued attempts to get on a good path, and I wish you all the best. I hope to hear good things from you. Good luck to you.

We are adjourned.

(Proceedings concluded at 11:49 a.m.)

COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

This 10th day of November, 2021.

/s/ Blanton Callen
Official Court Reporter
Registered Professional Reporter